**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Joseph V. NASH, Defendant–Appellant.**

Nos. 91–50760, 92–50310, 92–50374 and 93–50694.

United States Court of Appeals,
Ninth Circuit.

Submitted * June 6, 1994.

Withdrawn from Submission Dec. 21, 1994.

Resubmitted Aug. 17, 1995.

Filed Aug. 24, 1995.

Opinion Withdrawn Jan. 3, 1996.

Filed Feb. 6, 1996.

Opinion Withdrawn June 25, 1997.

Decided June 25, 1997.

* This panel unanimously agrees that this case is appropriate for submission without oral argument. Fed. R.App. P. 34(a); 9th Cir. R. 34–4.

Joseph V. Nash, Pro Se, Los Angeles, CA, defendant-appellant.

Carolyn J. Kubota and Dorothy Shubin, Assistant United States Attorneys, Los Angeles, CA, for plaintiff-appellee.

Before: FLETCHER, CANBY and HALL, Circuit Judges.

## ORDER

The opinion filed February 6, 1996, is withdrawn and the opinion below is filed in its stead.

## OPINION

CYNTHIA HOLCOMB HALL, Circuit Judge:

Joseph Nash appeals his convictions of making false statements to a federally insured lending institution in violation of 18 U.S.C. § 1014 and bank fraud in violation of 18 U.S.C. § 1344. The district court had jurisdiction pursuant to 18 U.S.C. § 3231, and this court has jurisdiction under 28

U.S.C. § 1291. In light of *United States v. Wells*, —— U.S. ——, 117 S.Ct. 921, 137 L.Ed.2d 107 (1997), and *Johnson v. United States*, —— U.S. ——, 117 S.Ct. 1544, —— L.Ed.2d —— (1997), we affirm but remand for resentencing in part.

## I. Background

Nash was charged in a fifteen-count superseding indictment. Counts 1 through 4 charged him with submitting false tax returns to Liberty National Bank in violation of 18 U.S.C. § 1014. Nash's partnership, Nash & Company, applied to Liberty National for a $250,000 line of credit and a $250,000 loan, each of which Nash offered to guarantee personally. As part of the application process, Nash submitted his personal income tax returns for 1985 and 1986. The indictment alleged that these returns "greatly overstated [Nash's] income for [those] year[s]" and that relying in part on the contents of these documents, Liberty National granted Nash & Company the loan and the line of credit. Nash also submitted these allegedly false tax returns to First Pacific Bank to obtain a $200,000 unsecured personal loan. This conduct formed the basis of counts 5 and 6, also charging Nash with violating 18 U.S.C. § 1014.

Counts 7 through 9 charged Nash with a scheme that began in 1985. Nash was the president and owner of First Professional Realty Company of America, Inc. In January 1985, he obtained for First Professional a $250,000 loan from Union Bank. First Professional held a promissory note from another business called TAG Properties (TAG). As of January 1985, the note obligated TAG to make three payments to First Professional of $450,000 each. To obtain the loan, Nash represented to Union Bank that First Professional would repay the loan with the future installments on this note. Union Bank, in an effort to ensure its right to receive the proceeds, requested that Nash give the TAG promissory note to it for safekeeping. Nash gave Union Bank a document which he incorrectly represented as the TAG note.

When Nash was later unable to repay the loan, he sought and received three extensions from Union Bank. The extensions in December 1986 and June 1987 were granted in reliance upon Nash's representation that Union Bank would receive the remaining amount due when TAG made its December 16, 1987, payment to First Professional. What Union Bank did not know, however, was that TAG had paid the note in full on or about January 20, 1986. It was alleged that Nash was aware of this final payment when he sought the extension. These activities form the basis of the bank fraud charged in Count 7 of the indictment. Counts 8 and 9 charged Nash with giving false statements to the bank, consisting of the December 1986 and June 1987 misrepresentations.

Nash received one other loan during this period. In September 1986, Nash applied to Great Western Bank for a $4,360,000 loan secured by an office building he owned in Beverly Hills. He represented to Great Western that the property was fully leased and would generate enough rent to repay the loan. In support of this claim, Nash submitted two seemingly genuine lease agreements. One lease showed Revel Travel as leasing the first floor of the Beverly Hills property for $20,340 per month. In reality, Revel Travel was paying only $10,500 per month. The other lease stated that McMurtry & Bell, an insurance company, was leasing the entire second floor of the Beverly Hills property for $20,093 per month until February 1, 1988. In reality, the insurance company was leasing on a month-to-month basis and paid only $2000 per month. Nash obtained the loan from Great Western and in return assigned to Great Western the lease proceeds from the Beverly Hills property. This conduct gave rise to counts 10 through 15 of the indictment. Counts 10 through 13 each charged Nash with bank fraud based on the loan application and the security agreement, promissory note, and assignment of leases between Nash and Great Western. Counts 14 and 15 charged violations of 18 U.S.C. § 1014 based on the submission of the inaccurate Revel and McMurtry leases.

Nash was convicted on all fifteen counts of the superseding indictment.

## II. 18 U.S.C. § 1014 Convictions

### A. *Gaudin* error

■ Nash claims that the district court failed to comport with the requirements of

*United States v. Gaudin*, 515 U.S. 506, ——, 115 S.Ct. 2310, 2314, 132 L.Ed.2d 444 (1995) when it instructed the jury that income and asset statements are material for purposes of 18 U.S.C. § 1014. A prior question, however, is whether materiality is even an element of section 1014. Although this court held in *United States v. Hutchison*, 22 F.3d 846, 851 (9th Cir.1993), that it was, the Supreme Court in *Wells* disagreed. —— U.S. at ——, 117 S.Ct. at 927. Accordingly, the government was not required to prove that the false statements were material. The district court's instruction that the statements were material as a matter of law did not take an element away from the jury and was therefore harmless.

### B. Sufficiency of the Evidence

◼ Nash argues that the evidence on counts one to six, which involved the submission of fabricated tax returns to banks in loan applications, was insufficient to support a conviction. In particular, he claims that the government never proved that the inflated income reported on the returns was false, only that it differed from the amounts reported to the IRS. We review a claim of insufficient evidence to determine whether, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the elements beyond a reasonable doubt. *United States v. Jones*, 84 F.3d 1206, 1210 (9th Cir.1996). We find that the evidence sufficed.

The government proved significant disparities in the figures for total income, adjusted gross income, taxable income, and interest income reported on the tax returns given to the banks and on the returns submitted to the IRS. Nash did not dispute that the returns submitted to the IRS were correct but testified the ones given to the banks were merely drafts that he revised after receiving amended Form 1099 reports of interest income earned. The jury had ample evidence from which to conclude that this explanation was implausible, however. In particular, it would be necessary to believe that he received 1099s from at least two sources that were inaccurate by exactly $1600 in one case and $9000 in another. Nash had also admitted that he testified to the contrary in a prior proceeding, thereby undermining his credibility. Under these circumstances, we think the jury was entitled to disbelieve Nash and conclude beyond a reasonable doubt that Nash falsified the tax returns.

### C. Variance between evidence and indictment

◼ The indictment alleged that Nash overstated his income on the tax returns. Nash argues that because the government only proved discrepancies in "total income," "adjusted gross income," and "taxable income," the evidence impermissibly amended the indictment. The term "income," however, at least when used in the context of an indictment alleging the use of a false income tax return, encompasses the more specific terms "total income," "adjusted gross income," and "taxable income." As a result, the crime proven at trial did not differ significantly from the one charged. At most, then, the proof at trial constituted a variance from the indictment, rather than an amendment to it. *See United States v. Momeni*, 991 F.2d 493, 495 (9th Cir.1993). Reversal on this ground is not warranted.

### D. Unanimity instruction

◼ Nash argues that the district court should have given a specific unanimity instruction on the false statement counts, but he did not request one at trial. Furthermore, there was no special complexity or ambiguity in the indictment and trial evidence that would have warranted such an instruction. As a result, we find no error.

### E. Instruction on Falsity

◼ Nash also contends that the district court erred in failing to give a specific instruction that the jury had to find that he falsely overstated his income to convict him under section 1014. But Nash never submitted a proposed instruction to the court, even though his counsel promised to do so. In this context, we review for plain error. *See United States v. Dorri*, 15 F.3d 888, 890–91 (9th Cir.1994). Since the court gave a generic instruction on section 1014 requiring proof that the statements were false, and read to

the jury the indictment, which charged Nash with falsely overstating his income, we find no prejudice to Nash, even if the court might have given a more specific instruction.

We therefore affirm all of the section 1014 convictions.

### III. 18 U.S.C. § 1344 Convictions

■ Nash argues that his bank fraud convictions should be reversed because the jury might have ·mistakenly believed it was required to find materiality as a matter of law on these counts as well. An initial question is whether the materiality requirement for section 1344, which this circuit inferred in *Hutchison,* 22 F.3d at 851, survives *Wells.* We hold that it does.

Although *Wells* does not directly address section 1344, it certainly disfavors inferring a materiality requirement where the statutory language does not expressly include one. *See* —— U.S. at ——, 117 S.Ct. at 927 (focusing on the "natural reading" of the language of the statute). The relevant part of section 1344 makes it a crime to "knowingly execute[ ], or attempt[ ] to execute, a scheme or artifice ... to obtain any of the moneys, funds, credits, assets, securities or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344(2). The statute does not mention materiality, and the government argues, following *Wells,* that materiality is not an element of the offense.

*Wells,* however, leaves open the possibility of inferring a materiality requirement where it is part of the settled common-law meaning of the statutory language. —— U.S. at ——, 117 S.Ct. at 927. Unlike section 1014, which concerns "false statements," section 1344 involves false "pretenses, representations, or promises." The term "representation" has been held to include some notion of materiality at common law. *See id.* at ——, 117 S.Ct. at 928 (use of term "representation" could imply a materiality element); *Kungys v. United States,* 485 U.S. 759, 781, 108 S.Ct. 1537, 1551–52, 99 L.Ed.2d 839 (1988) (noting that "misrepresentation" has been held to carry a materiality requirement in many con-

texts); *United States v. Bonnett,* 877 F.2d 1450, 1456 (10th Cir.1989) ("a representation has long been held to consist of words, made orally or in writing, or other conduct manifesting to another the existence of a material present or past fact"). As *Wells* states, courts should "presume that Congress incorporates the common-law meaning of the terms it uses if those 'terms ... have accumulated settled meaning under ... the common law' and 'the statute [does not] otherwise dictat[e].'" —— U.S. at ——, 117 S.Ct. at 927 (quoting *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322, 112 S.Ct. 1344, 1348, 117 L.Ed.2d 581 (1992)). Nothing in section 1344 indicates an intent to deviate from the settled meaning of these terms.

This conclusion becomes clearer when we look at the overall nature of the provision. Section 1344 is concerned with fraud, like the mail and wire fraud statutes on which it is based. *See* 18 U.S.C. §§ 1341 and 1343. The tort and crime of fraud, both at common law and its more modern statutory forms, has carried an implication of materiality. *See* Black's Law Dictionary 29, 602 (6th ed.1990) (defining "actionable fraud" and "false representation") Section 1014, on the other hand, falls into the different category of false statement statutes, which have not consistently required materiality. *See Wells,* —— U.S. at —— – ——, 117 S.Ct. at 928–29. Given these differences, we do not believe that *Wells* requires us to depart from this court's prior holdings that section 1344(2) requires proof of materiality.

■ We next turn to the question of whether the district court erroneously instructed on materiality. At trial, the court instructed the jury on the elements of both section 1014 and section 1344, including the requirement of materiality. The jury was then told that "[f]alse statements of income and assets are material for the purposes of *these instructions.*" Jury Instruction 40. Nash argues that the jury might have applied instruction 40 to the section 1344 counts as well as the section 1014 counts. As a result, he claims, the instruction improperly takes the matter from the jury in violation of *Gaudin.*

Even if Nash is correct, though, we do not believe any *Gaudin* error in this context warrants reversal. In *Johnson*, the Supreme Court held that *Gaudin*-type errors not asserted at trial should be reviewed for plain error pursuant to Fed.R.Crim.P. 52(b), contrary to this circuit's holding in *United States v. Keys*, 95 F.3d 874 (9th Cir.1996). — U.S. at —, 117 S.Ct. at 1548. Nash did not object to the materiality instruction at trial. As a result, before we can correct any deficiency in the instruction, we must find (1) an error that is (2) plain and (3) affects substantial rights. Even if these conditions were met, we may only exercise our discretion to correct the error if it "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *Johnson*, — U.S. at — — —, 117 S.Ct. at 1548–49; *United States v. Olano*, 507 U.S. 725, 733–36, 113 S.Ct. 1770, 1777–79, 123 L.Ed.2d 508 (1993).

Even if we accept that the instruction was erroneous, that the error was plain at the time of appellate consideration, as *Johnson* requires, *see* — U.S. at —, 117 S.Ct. at 1549, and that it affects substantial rights, Nash cannot meet the fourth prong of the plain error analysis: that the error seriously affected the fairness, integrity or reputation of the proceedings. There is no question that the representations on which the bank relied were material for purposes of section 1344. Nash grossly understated the lease revenue intended to secure the $4 million from Great Western Bank; he claimed that the building generated rents of more than $40,000 per month when in reality it only produced about $12,500 per month. The fact that one of the leases was month-to-month, rather than having a fixed term, would also have been material to the bank's decision. On the other fraud count, Nash represented that he would repay the Union Bank loan using proceeds from the TAG promissory note, which he knew in fact no longer existed. Under these circumstances, any failure to submit the materiality issue to the jury did not prejudice *Nash*. Accordingly, under the standard set out in *Johnson* and *Olano*, the error does not affect the fairness of the proceedings, and we lack discretion to correct it under Rule 52(b).

## IV. Multiplicity

Nash alleges several ways in which the counts in the indictment are multiplicitous.

## A. Overlap Between Bank Fraud and False Statement Counts

The first argument is that the charges of fraud and making false statements penalize the same conduct and therefore violate the Double Jeopardy Clause of the Fifth Amendment. The appropriate inquiry is whether Congress intended to prescribe multiple punishments for the same conduct. *Albernaz v. United States*, 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981); *United States v. Alerta*, 96 F.3d 1230, 1238 (9th Cir.1996). The Supreme Court has held that the test from *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), governs this determination. *Albernaz*, 450 U.S. at 337–39, 101 S.Ct. at 1141–42. Thus, if each offense requires proof of a fact that the other does not, the offenses are not multiplicitous, absent a clear indication of contrary legislative intent. *Id.; Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182.

Whether sections 1344 and 1014 are multiplicitous appears to be a question of first impression in this circuit. Other circuits have split on the issue. The Second Circuit has held that, at least in some circumstances, the crimes are multiplicitous. *See United States v. Seda*, 978 F.2d 779, 781–82 (2d Cir.1992). The First Circuit, on the other hand, recently decided that the two offenses met the *Blockburger* test. *See United States v. Fraza*, 106 F.3d 1050, 1054 (1st Cir.1997). No court has reviewed this issue since the Supreme Court's interpretation of the elements of section 1014 in *Wells*.

Initially, we agree with the First Circuit that in evaluating this question we should look to the elements of the offenses alone, rather than the way they are charged in the indictment, as in *Seda*. Following this approach, we also find that section 1014 and 1344 satisfy the *Blockburger* test. Section 1344 requires proof that defendant knowingly engaged in a scheme to defraud a federally insured institution or to obtain money under the custody or control of such an institution

by means of material false statements or representations. *Hutchison,* 22 F.3d at 851. Section 1014 requires the government to show that the defendant made a knowing, false statement to the bank for the purpose of influencing its action on a loan. *See id.; Wells,* —— U.S. at ——–——, 117 S.Ct. at 926–27. Section 1344 clearly requires proof of elements that section 1014 does not; there must be a scheme or artifice, and the false representations must be material.

The more difficult question is whether section 1014 requires proof of any element that section 1344 does not. Although there are probably few cases of bank fraud that do not involve making a false statement to a federally insured institution, section 1014 requires that the statement be made to influence action on a loan. The bank fraud statute, which is written more broadly, technically does not. It is enough that the defendant attempt to obtain money under the custody or control of a bank; the statement need not be intended to influence action on a loan, even if that is a principal way of obtaining money from a bank. Since there is no other evidence that Congress intended to prohibit charging defendants with both crimes, we hold that the indictment under both sections 1014 and 1344 for the same conduct is not multiplicitous.

**B. Bank Fraud Counts 10 to 13**

■ Nash also contends, and the government concedes, that Counts 10 through 13 arising from the Great Western loan are multiplicitous. *See United States v. Molinaro,* 11 F.3d 853, 860 (9th Cir.1993) ("the unit of the offense created by § 1344 is not each act in furtherance of a scheme to defraud but each execution or attempted execution of the scheme to defraud"). The question is what

remedy is appropriate. Nash claims that the remedy for this error is a new trial. Even assuming that such relief might ever be warranted for multiplicity, this appeal is not a candidate for it because the government would have introduced exactly the same evidence had the indictment contained only one count of bank fraud relating to the Great Western loan. *See United States v. Lilly,* 983 F.2d 300, 305 (1st Cir.1992).

Nash claims alternatively that resentencing is required. The government responds that resentencing is unnecessary because the sentences on counts 10 through 13 are concurrent.

In another appeal involving similar facts we did indeed instruct the district court that "a sentence can be imposed on each [multiplicitous] count but must run concurrently with every other sentence on a [multiplicitous] count." *Molinaro,* 11 F.3d at 864. Hence we would agree with the government if its factual premise was accurate, but it is not. The district court imposed a $50 special assessment on each of these counts.[1] Since Nash's "liability to pay this total depends on the validity of each of his ... convictions, the sentences are not concurrent." *Ray v. United States,* 481 U.S. 736, 737, 107 S.Ct. 2093, 2094, 95 L.Ed.2d 693 (1987) (per curiam). The district court sentenced Nash to a total of ten years imprisonment on the four § 1344 counts. Because he has not yet served the totality of this sentence, we remand counts 10 through 13 to the district court for resentencing consistent with this opinion.

**C. False Statement Counts 1 to 6**

■ Nash contends that these false statement counts are multiplicitous because they involve multiple uses of the same set of false documents. He argues that submitting

---

1. The judgment and commitment order describes the sentences on counts 10 through 13 as running concurrently. The sentencing transcript describes the sentences on counts 10 and 11 as concurrent to each other and the sentences on counts 12 and 13 as concurrent to each other but states that the sentences on counts 12 and 13 shall run consecutively to the sentences on counts 10 and 11. We note that Nash's total sentence of 11 years comports with the sentence described in the judgment and not the sentence as it is set forth in the sentencing transcript.

Nevertheless, "'[t]he only sentence that is legally cognizable is the actual oral pronouncement in the presence of the defendant.'" *United States v. Bergmann,* 836 F.2d 1220, 1221 (9th Cir.1988) (citation omitted). Because we find the sentences are not concurrent even as they are described in the judgment, we need not consider the many issues raised by the inconsistency between the transcript and the judgment.

falsified 1985 and 1986 tax returns should constitute a single false statement, rather than two, and that submitting the tax returns to obtain both a loan and a line of credit cannot support separate counts. We disagree.

In *United States v. Kennedy,* 726 F.2d 546 (9th Cir.1984), this court held that separate sentences under section 1014 may be imposed for each for false document or set of false documents submitted to the bank. *Id.* at 548. Nash relies on the "set of documents" language to conclude that contemporaneous submission of false documents can support only one charge under section 1014. Although *Kennedy* is admittedly ambiguous, we do not read it so narrowly. The cases from the Fifth and Eleventh Circuits that *Kennedy* follows allowed multiple counts for each false statement on a separate document and, in fact, for the same false statement used to obtain multiple loans. *See United States v. Glanton,* 707 F.2d 1238, 1240 (11th Cir.1983) (finding each false statement on separate document to be separate count); *United States v. Miranne,* 688 F.2d 980, 986 (5th Cir.1982) (upholding 42 separate charges for use of single false statement to obtain 42 loans). We therefore conclude that the 1985 and 1986 false tax returns were separate documents that could independently support separate counts under section 1014. Furthermore, using the same documents to obtain a loan and a separate line of credit also warrants two charges. Counts one to six were not multiplicitous.

## V. Other asserted errors

Nash asserts that several other errors were made during and after the trial. We find his claims unpersuasive.

### A. Prosecutorial Misconduct

■ Nash argues that the prosecutors impermissibly vouched for government witnesses when they stated that those witnesses had no motive to lie. The prosecutors' statements, however, were simply inferences from evidence in the record. They were not references to extra-record facts or personal guarantees of the witnesses' veracity. *United States v. Necoechea,* 986 F.2d 1273, 1279 (9th

Cir.1993); *see also United States v. Molina,* 934 F.2d 1440, 1445 (9th Cir.1991) ("prosecution must have ... freedom to argue reasonable inferences based on the evidence"). The prosecutor's statement that Nash lied during his testimony is also a proper basis for government argument. *See Molina,* 934 F.2d at 1445 (finding it "proper for the government to argue that the jury ought not to believe the appellant's version"). We conclude that the government did not vouch or impermissibly question Nash's veracity.

### B. Evidentiary Rulings

■ Nash also argues that the district court erroneously allowed the government to introduce evidence of nonpayment on counts one to six because failure to pay is not relevant to establishing an intent to influence. Nash did not object to this evidence at trial, however, and we think that the other evidence of his guilt is sufficient that any error does not meet the Rule 52(b) plain error standard of *Olano.* He also contends that the district court erred in restricting evidence of repayment on counts 7 through 15 (the Union Bank and Great Western loans). But the record reflects that Nash did introduce evidence of repayment, and Nash has not specifically identified any evidence that was excluded. His claim is without merit.

■ Finally, Nash argues that the district court abused its discretion in excluding the expert testimony of his accounting witness, who would have testified that the allegedly false tax returns relevant to counts one to six did not overstate his income. But Nash failed to disclose the expert witness' existence, let alone his conclusions, to the government, in violation of the district court's discovery order. Even if we accept as true Nash's claim that he did not decide to use an expert witness until a week before calling the witness to testify, he could have made the proper disclosure at that time. Nash had a continuing obligation to disclose under the discovery order, and he presents no justification for calling the expert without any prior notification. The district court did not abuse its discretion in concluding that the failure to disclose was willful and was justified in excluding the witness' testimony on

that ground. *See Taylor v. Illinois,* 484 U.S. 400, 415, 108 S.Ct. 646, 656, 98 L.Ed.2d 798 (1988). Although the remedy of excluding a witness may be harsh, in this case the testimony was of limited relevance. Even if the witness testified that the two sets of returns could have been reconciled as being based on different accounting methods, that would not necessarily show that Nash had intended to use two different methods. As a result, it would not necessarily refute the government's contention that he falsified the set of returns given to the banks.

## C. Trial Court Bias

 Nash argues that the district court's participation and comments at trial evidenced a bias that projected to the jury an appearance of partiality. "A federal judge has broad discretion in supervising trials, and his or her behavior during trial justifies reversal only if it abuses that discretion. A trial judge is more than an umpire, and may participate in the examination of witnesses to clarify evidence, confine counsel to evidentiary rulings, ensure the orderly presentation of evidence, and prevent undue repetition." *United States v. Laurins,* 857 F.2d 529, 537 (9th Cir.1988) (citations omitted). Nash's assertions are unsupported by the record. The trial judge's conduct fell completely within the discretion accorded him to supervise the trials in his court.

## D. Post–Trial Request for New Counsel

Nash claims the district court denied his post-trial request for new counsel or alternatively to proceed pro se. He mischaracterizes the facts, however. The district court specifically did *not* deny Nash's request for substitution of counsel. Rather, the district court initially declined to rule on the request until Nash thought his "way through on that and decide[d] what [he] want[ed] to do." Later, the district court granted Nash's request for substitution of counsel. There simply was no denial of a request for new counsel or to proceed pro se.

**2.** It is not clear from the record whether Nash objected to this conclusion at sentencing. If he did not, we would review for plain error. Since

## E. Disclosure of Sealed Records

 Nash seeks disclosure of the grand jury testimony of a government witness, Agent Chamberlain, alleging that it constitutes Jencks Act and *Brady* material. We review a district court's denial of a motion to produce a witness' statement pursuant to the Jencks Act for abuse of discretion. *United States v. Brumel–Alvarez,* 991 F.2d 1452, 1457 (9th Cir.1992). In Nash's request to unseal the grand jury documents, he alleges the grand jury testimony would have assisted him in impeaching Chamberlain. We have reviewed Chamberlain's testimony before the grand jury and it did not relate to her testimony at trial. The district court properly denied Nash's request for disclosure.

 In addition, Nash asks to have all documents unsealed. To the extent he is seeking release of all information surrounding the grand jury proceedings, he has failed to demonstrate particularized need which would overcome the policy of grand jury secrecy. *United States v. Procter & Gamble, Co.,* 356 U.S. 677, 683, 78 S.Ct. 983, 987, 2 L.Ed.2d 1077 (1958). To the extent he seeks any other documents that were filed under seal and not previously released, he has not identified them in his briefs on appeal. His motion before the trial court identified entries from the docket but it is impossible to identify any reason for disclosing those items. We conclude that Nash is not entitled to the disclosure of any of the documents he requests.

## VI. Sentencing Issues

## A. Applicability of the Sentencing Guidelines

 The district court found that counts 7 through 15 were preguidelines offenses.[2] Although the sentencing guidelines generally do not apply to offenses committed before Nov. 1, 1987, they may apply to certain "continuing violations" begun before that date but not completed until after it. *See Hutchison,* 22 F.3d at 854. Initially, we must determine whether section 1344 is the

we conclude that the district court did *not* err in any event, we need not consider whether the plain error standard should apply.

type of offense that can be a continuing violation. This court has held that there is a presumption against finding continuing violations unless the language of the statute compels such a conclusion or the nature of the crime involved is such that Congress "must assuredly have intended that it be treated as a continuing one." *United States v. Niven,* 952 F.2d 289, 291 (9th Cir.1991). Although it does not discuss the issue, *Hutchison* treated a section 1344 violation as a continuing offense, and we think it was correct in doing so. *See* 22 F.3d at 854. Section 1344 punishes the execution of a scheme to defraud or obtain money—language that suggests the violation should be treated as continuing. Although *Niven* held that mail and wire fraud could not be continuing violations, those offenses punish each use of the mail or wires. Section 1344, on the other hand, involves the execution of the overall scheme.

The question then becomes whether, under the facts presented, Nash's scheme extended beyond Nov. 1, 1987. Although the indictments for counts 7 and 10–13 on the bank fraud counts charge that the scheme to defraud continued into 1988, all of the specific incidents mentioned occurred before Nov. 1, 1987. It does not appear that any evidence adduced at trial showed that the scheme continued into 1988. As a result, we do not believe the district court's finding that the offenses were completed prior to Nov. 1, 1987, was clearly erroneous.

Counts 8, 9, 14 and 15, which charge violations of section 1014, do not require a scheme to defraud but instead punish each false statement. We therefore conclude that they cannot support a continuing violation under the standard in *Niven.* Since the false statements were all made before Nov. 1, 1987, the district court correctly found that they are preguidelines offenses.

## B. Resentencing under Rule 35(c)

■ Nash also challenges the modifications to his sentence under Fed.R.Crim.P. 35(c) on the theory that the district court lacked jurisdiction to correct his sentence once he had filed his notice of appeal. Although Fed. R.App. P. 4(b) now explicitly states that the district court retains jurisdiction over a Rule 35(c) motion in this situation, it did not at the time of resentencing. Nevertheless, the prior rule was merely silent on the matter; it did not require a contrary result. *See United States v. Clay,* 37 F.3d 338, 340 (7th Cir.1994) ("It would make little sense to complicate matters with a special rule for the two years it took to iron out the ambiguities that Rule 35(c) potentially portended for Rule 4(b) (but that Congress eventually insured it did not)"). As a result, we conclude that the district court retained jurisdiction to correct its sentence under Rule 35(c) even under the old version of Rule 4(b).

■ Nash also argues that the modifications imposed by the district court exceed the scope of its authority under Rule 35(c). The guideline range for counts one to six was 27 to 33 months, but the district court initially sentenced Nash to 24 months on each count to be served concurrently. The court amended the sentence pursuant to U.S.S.G. § 5G1.2(d), which provides that if "the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment. In all other respects sentences on all counts shall run concurrently." The original sentence was clearly erroneous under the guidelines because it was less than the guideline minimum. As a result, the district court was within its authority to modify the sentence on count six to be three months, to be served consecutively to the 24 months on counts one to five. The court was also correct in reducing the period of supervised release from five years to one year, the maximum allowable period.

Nash's claims that he did not receive adequate notice of the Rule 35(c) hearing are without merit.

## C. Restitution Order

■ Finally, Nash challenges the district court's order that he pay restitution totalling $893,979 because, he argues, it failed to consider his indigence. We review a

restitution order for abuse of discretion, so long as it is within the statutory framework. *United States v. Pappadopoulos,* 64 F.3d 522, 530 (9th Cir.1995). The district court must consider the defendant's financial resources and earning ability in imposing restitution, 18 U.S.C. § 3664(a), but defendant has the burden of showing his financial resources and needs. § 3664(d). Nash never completed the financial statement requested during the preparation of his presentencing report.[3] As a result, we do not believe he has met his burden to show his inability to pay restitution. Given this lack of cooperation at sentencing, the district court was entitled to disbelieve his claims of indigence and order restitution.

## Conclusion

Nash's convictions are AFFIRMED, as is his sentence except on counts 10–13. With regard to those counts, the sentence is vacated and the matter remanded for resentencing in a manner consistent with this opinion.

---

**3.** In particular, he left blank the sections requesting information about his real estate holdings, mortgages, life insurance and motor vehicles.